Michael S. Adler, SBN 190119
  madler@ta-llp.com
Joel M. Tantalo, SBN 206096
  jtantalo@ta-llp.com
**TANTALO & ADLER LLP**
1901 Avenue of the Stars, Ste. 1000
Los Angeles, CA 90067

Telephone:  (310) 734-8695
Fax:           (310) 734-8696

SPECIALLY APPEARING
Attorneys for Defendant
Ashot Yegiazaryan

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITALY IVANOVICH SMAGIN<br><br>Plaintiff,<br><br>v.<br><br>ASHOT YEGIAZARYAN and CTX TREUHAND AG as Trustee for the ALPHA TRUST<br><br>Defendants. | **CASE NO. 17-cv-6126-R (PLAx)**<br><br>Before the Honorable Manuel L. Real<br>United States District Judge<br><br>**DECLARATION OF ASHOT YEGIAZARYAN IN SUPPORT OF**<br><br>**MOTION TO DISMISS OR IN THE ALTERNATIVE STAY THIS ACTION IN FAVOR OF AN ACTION PREVIOUSLY INITIATED BY PLAINTIFF**<br><br>**Hearing Place:**    Courtroom 880<br>**Hearing Date:**    December 18, 2017<br>**Hearing Time:**    10:00 a.m. |

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

## <u>DECLARATION OF ASHOT YEGIAZARIAN</u>

I, Ashot Yegiazaryan, do hereby declare as follows:

1. I am a named defendant in this action. Except as otherwise indicated, I have personal knowledge of the facts declared herein and could and would competently testify thereto in a Court of Law if required to do so. Although English is not my native language, I have had this declaration translated to me and I believe this to be an accurate statement of the facts set forth herein.

### Personal Background and Profession as a Legislator Until 2011

2. I became involved in Russian government and political activities in the second half of the 1990s. In 1996, I took part in organizing the financing of Boris Yeltsin's ("Yeltsin") presidential campaign. In 1997, I was an advisor for the Russian Central Bank (the Russian equivalent of the U.S. Federal Reserve).

3. At the time, I also served as an advisor on a pro bono basis for Yuri Maslyukov, the First Deputy Prime Minister.

4. In 1999, I was elected to the State Duma. I was reelected to the State Duma in 2003 and 2007. During my time as a Deputy of the State Duma, I was appointed to various positions including deputy chairman of the Committee on Budget and Taxes, deputy chairman of the Commission to Promote a Political Settlement and Adherence to Human Rights in the Chechen Republic and a member of the Commission on the State Debt of the Russian Federation.

5. I began to fall out of political favor around 2005, largely because I was allied with the former Prime Minister Mikhail Kasyanov and my association with him was perceived as a sign of disloyalty.

### Investments in Russia and Disputes with Connected Individuals

6. Although I was a legislator by profession between 1999 and 2010, I did make some investments during that time. Those investments included at least two real estate projects: the Europark Shopping Center and the Moskva Hotel.

7. Other investors in the Moskva Hotel included the City of Moscow,

Vladimir Putin's long-time judo partner Arkady Rotenberg and Vladimir Putin's former masseuse Konstantin Goloschapov.

8.      After I fell out of political favor with the political authorities in Russia, certain partners pressured me to surrender my investment in the Moskva Hotel.  When I refused to quietly give up my investment, I was subjected to various forms of official and unofficial harassment.  Ultimately, I filed an arbitration award in the London Court of International Arbitration against high-ranking individuals within the Russia government.

### Flight from Russia in the Face of Death Threats

9.      I left Russia in the summer of 2010, in large part because I began receiving threats of reprisal to 'stay away' from the Moskva Hotel Project. I reported these threats to the Russian police but they took no serious action.  This was long before I was named as a suspect in respect of any alleged charges and long before the Russian arrest warrant was issued.  These threats included threats against myself and also my family, such as threats to behead my children.  A family member of mine was killed in Russia in 2010 and I believe it was done to send me a message.

### Politically-Motivated Arrest Warrant

10.     While I was in the United States, and after I filed my affirmative claims in London, the Russian authorities in October 2010 took moves to strip me of my parliamentary immunity, summoned me for questioning and placed me on a wanted list.  Placing me on the wanted list was improper, because this may be done only where a person's whereabouts are unknown, whereas I had promptly informed investigators of my address in the United States and my safety concerns about returning to Russia. Investigators dismissed my lawyers' objections out of hand and published a notice through INTERPOL.

11.     Unfortunately, it is my understanding that INTERPOL is little more than a clearing house for arrest and extradition requests from foreign countries, such that it is open to abuse.  As noted in the Economist article attached hereto as Exhibit 1, Russia

1

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

is particularly notorious for this practice.  In any event, an INTERPOL notice is not evidence of guilt and INTERPOL itself emphasizes that persons subject to INTERPOL notices enjoy a presumption of innocence. I note that the United States has not acted on Russia's request.

12.     I have no confidence in the Russian criminal investigation or my safety if I were to return to Russia.  The Economist article mentioned above refers to the notorious Russian case of Sergei Magnitsky as a particularly acute example of the abuse of Russian criminal proceedings.  That case involves allegations that the Russian officials investigating the case forged documents and stole money from the persons under investigation. After one of the accused's lawyers, Sergei Magnitsky, complained about these abuses, he was thrown in prison where he died; it is alleged that he was subjected to abuse in prison and that is why he died.

13.     The Magnitsky case has been the subject of censure by the European Parliament and the United States Congress, the latter of which imposed sanctions on a number of Russian officials involved in the investigation.

14.     No less than seven of the Russian officials involved in my investigation also handled the Magnitsky case, and five of the officials involved in my case (Aleksey Droganov, Victor Grin, Oleg Logunov, Andrei Krechetov and Andrei Strizhov) have been placed under sanctions by the U.S. State Department for their involvement in the Magnitsky case.

15.     In addition to those individuals, other individuals involved in proceedings against me have been identified as connected with the Putin regime in news reports about contacts with the Trump election campaign.  Attached hereto as Exhibit 2 is a true and correct copy of a July 15, 2017 article from the *New York Times* entitled "Soviet Veteran Who Met with Trump Jr. Is a Master of the Dark Arts" reporting on activities of Rinat Akhemtshin on behalf of those connected with the regime.  As reflected in that article, Mr. Akhemtshin assisted others connected with the Putin regime against me.  Likewise, attached hereto as Exhibit 3 is an August 21, 2017

article from the *New York Times* entitled "Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections," explaining that, *inter alia,* Mr. Akhemtshin is suspected in the hacking of my counsel on behalf of Putin-connected parties.

16. The passport I had at the time I fled from Russia has expired.  Because of my conflict with the current regime in Russia, I have been unable to get a new passport or other similar travel documents.  I remain a Russian citizen (and am not a citizen of the United States or any other country) despite my difficulties with the current regime in Russia.

17. Moreover, because of the politically-motivated arrest warrant, the listing on Interpol, and my lack of current documents, I am unable to obtain a personal banking account.  For example, I have repeatedly tried to open a simple bank account in Los Angeles and been repeatedly refused.

### Mr. Smagin Initiated a Freezing Order Against Me in Russia that Secures Hundreds of Millions in Assets

18. In connection with his claims against me, Mr. Smagin has filed a civil claim within the criminal case against me.

19. During the underlying arbitration in this matter, I was shown pleadings by Mr. Smagin's counsel wherein Mr. Smagin asserted that the purpose of the Russian freeze was to secure any possible recovery in the arbitration.

20. The orders attach at least three significant sets of assets.  The first and most significant set of assets relate to Europark, the Moscow shopping center at the heart of the underlying arbitration in this matter.  In his claims, Mr. Smagin asserted that he had been wrongfully deprived of a 20% interest in Europark.  However, with the Russian Freezing Order, Mr. Smagin has frozen 100% of the assets of Europark and of the company that owns Europark.  In other words, Mr. Smagin has secured property worth 5 times the property underlying his original claim.  Technically, my interest in those properties is only a 50% interest, but even just considering my interest in the Europark shopping center, Mr. Smagin has frozen assets in Russia worth 2.5

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

times his claim.

21.     The most recent valuation of Europark, presented by Mr. Smagin himself, valued Europark at over $360 million dollars.  As such, the most recent valuation of Europark places my 50% interest – frozen for Mr. Smagin under the Russian Freezing Orders – at over $180 million dollars.

22.     In addition to Europark, I own at least two pieces of real estate in Moscow that have been frozen for Mr. Smagin by the Russian Freezing Orders.  One of those pieces of real property is a sizable piece of property available for development in one of the most expensive neighborhoods of Moscow on Rublevskoye Shosse.  The property would be appropriate for an apartment complex.  This is in addition to the Europark assets mentioned before.

**Important Background on the Kerimov Settlement**

23.     The funds referred to in this motion as the "Kerimov Settlement" arose out of an arbitration before the London Court of International Arbitration ("LCIA").  This LCIA claim related to the Moskva Hotel.

24.     Mr. Smagin had no involvement in the Moskva Hotel, and my claims against other parties in the Moskva Hotel were independent of Mr. Smagin.  At no time did Mr. Smagin have any rights with respect to the Moskva Hotel.

25.     My LCIA claims relating to the Moskva Hotel were filed before Mr. Smagin filed the underlying arbitration demand in this matter.

26.     I was not the only claimant in the specific arbitration that lead to the Kerimov Settlement.  Evidence previously submitted in this court in another matter establishes there were in fact five separate claimants, including my brother Artem Yegiazyaran.

27.     That specific LCIA arbitration proceeded entirely in London, where myself and my co-claimants were represented by the London offices of Gibson, Dunn & Crutcher.  That arbitration entirely involved matters that occurred in Russia and Europe.

4

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

28.     Moreover, the specific arbitration that led to the Kerimov Settlement was actually one of three LCIA arbitrations that I initiated with various other co-claimants arising out of the Moskva Hotel.  Those arbitrations were brought as separate proceedings because the various respondents were parties to different LCIA arbitration agreements and some of those respondents refused to agree to their consolidation in a single LCIA arbitration, which would have otherwise been possible under the LCIA arbitration rules.  The different arbitrations also involved different claimants.  However, from my perspective, all three arbitrations were a collective undertaking to recover the stolen interests in the Moskva Hotel.

29.     I was the lead claimant in all three arbitrations, but I had co-claimants in those arbitrations including not only my brother Artem Yegiazaryan but an individual named Vitaly Gogokhiya.

30.     These three LCIA arbitrations over the Moskva Hotel were major undertakings, with legal fees well in excess of ten million dollars.  Given that the Russian government (with the cooperation of Mr. Smagin) issued the Russian Freezing Orders soon after we initiated the LCIA arbitrations, almost the entire amount had to be financed through third-party funding.

31.     As a result, in 2011, I reached agreements with various parties to assist me in funding and prosecuting those arbitrations (as well as paying my living expenses during the interim).  Most significantly, I entered into agreements with two co-claimants (Artem Yegiazaryan and Vitaly Gogokhiya) to help prosecute those arbitrations, as well as an agreement with my cousin Suren Yegiazaryan.

32.     The substance of those agreements was that those parties would assist me in prosecuting the arbitrations and would provide funding for such litigation and for my living expenses.  In return, I would provide them with a share of any recovery from the Moskva Hotel arbitrations.

33.     Pursuant to these agreements, I received significantly more than ten million dollars worth of funding for the arbitrations at issue.  As of June 2015, when

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

we received the Kerimov Settlement, Suren alone had provided more than $11,491,000 dollars in support under our 2011 agreement, and Artem had provided more than $10,134,000 million dollars.  Since then, they have paid many millions of additional dollars in reliance on our agreement that they would advance funds in return for an interest in any recovery from the Moskva Hotel.

34.     This was entirely speculative on their part, and I would likely have been unable to repay them if we had not been successful in recovering any money in the arbitration.

35.     Eventually, after an LCIA ruling in our favor, the co-claimants and I were able to negotiate a settlement in the Kerimov arbitration that led to the "Kerimov Settlement."  However, while the payment was made in my name as I was the lead claimant, I was obligated at all times to share those funds with Artem, Suren, and Vitaly Gogokhiya.

36.     As reflected in the settlement agreement itself, the Kerimov Settlement payment was made to the London offices of Gibson, Dunn & Crutcher in mid-2015.  Those funds were never received in the United States, but were received by the UK client trust account of the UK office of Gibson, Dunn & Crutcher, the London-based counsel who prosecuted the arbitrations on our behalf.

37.     That settlement was received in London *after* Mr. Smagin had secured his underlying arbitration award, but at a time when the English courts had enjoined any effort by Mr. Smagin to collect on the award in England or Wales.  The settlement was also received before Mr. Smagin had any judgment in this Court, and it was received at a time (as now) when Mr. Smagin had already frozen Europark and other Russian assets sufficient to secure the arbitration award, assuming he was ultimately successful.  As a result, there was no limitation on my ability to receive the award on behalf of myself and my co-claimants.

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

**The Liechtenstein Trust Was Created to House the Funds and Share with The Others Entitled to Share in Funds from the Moskva Hotel**

38.     At the time they received the initial settlement payment, our London arbitration counsel informed me that the sum was too large for them to maintain in their client trust account for any extended period of time.  I was told that we needed to find a place to receive such funds within days or London counsel might return the funds back to the respondents in the arbitration.

39.     I tried very hard to find a bank account that would accept these funds in my own name.  However, as noted above, my lack of a passport and the fact that Russia had published a red notice against me through Interpol prevented me from being able to open a bank account in the United States.  I made various efforts to try to find a bank that would open an account for me, but these were rebuffed by numerous banks throughout the world.

40.     Eventually, CTX Treuhand AG, a law firm in Liechtenstein that also provides professional trustees services, proposed a solution.  Although they were unable to open a bank account in my name (as they initially sought to do), they found a bank that was willing to take on the funds if the account was under the ultimate control of a trust that would own the funds.

41.     At the time we set up the Alpha Trust, I explained to the trustees that I was not the only person with an interest in the funds.  In particular, at that time, Artem, Suren, and Vitaly Gogokhiya all had participation interests in those funds.

42.     The representatives of CTX Treuhand explained to me that, given the need to set up the documents immediately, we should use a standard form of trust agreement they already had on hand, but that they could promptly amend the trust agreement to reflect the fact that Artem, Suren, and Vitaly Gogokhiya were entitled to benefit from those funds.

43.     Therefore, given the urgency of setting up the Alpha Trust to receive funds from the Gibson, Dunn & Crutcher client trust account in London, that is what

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

we did.  First, we signed the basic document to set up the Alpha Trust and allow it to receive the funds from London, and shortly thereafter CTX Truehand amended the Alpha Trust to reflect the fact that Artem, Suren, and Vitaly Gogokhiya were all intended beneficiaries.

44.     This trust structure met two key goals for me.  First, it allowed us to receive the funds from the London client-trust account so they could not be sent back to the respondents in the Kerimov arbitration.  Second, it allowed the parties with an interest in the funds from the Moskva Hotel arbitrations to receive their interests. I did not set up the Alpha Trust to hide anything from Mr. Smagin.  I fully disclosed the existence of the Alpha Trust to Mr. Smagin in my first set of responses to interrogatories as to assets outside of California.

### Facts About the Alpha Trust

45.     The Alpha Trust is a Liechtenstein Trust, which provides for administration of the trust in the country of Liechtenstein.  True and correct copies of relevant portions of the Alpha Trust documents are attached hereto as Exhibit 4.

46.     Even before Mr. Smagin secured his orders in Liechtenstein attaching my rights there, I did not possess or control the funds in the Alpha Trust.  The terms of the Alpha Trust require the trustees to consider any request from myself or any of the other beneficiaries, but they do not require those trustees to grant such requests merely because I seek them.

### Lack of Service of the Complaint in This Matter

47.     My current home address is in Beverly Hills, California.

Declaration of Ashot Yegiazaryan ISO Motion to Dismiss

48.    No copy of the summons and complaint in this matter has ever been delivered to me personally, and I have not authorized any other person to accept service on my behalf.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct and that this declaration was executed on November 14, 2017 in Los Angeles County, California.

Ashot Yegiazaryan
(also spelled Ashot Egiazaryan)

# Declaration of Ashot Yegiazaryan Exhibit 1



### Abusing Interpol
# Rogue states

**Cross-border policing can be political**

Nov 16th 2013 |  From the print edition

FOUR years ago this week the whistle-blowing accountant Sergei Magnitsky died in jail from beatings and abuse, having uncovered a $230m fraud against the Russian state. His client Bill Browder, a London-based financier, has been campaigning to punish those responsible with visa bans and asset freezes. But the Russian authorities have retaliated and are trying to extradite him on fraud charges, using Interpol, the world police co-operation body.

No Western country is likely to send Mr Browder to Moscow. But his travel plans are stymied by the risk of arrest . He had to cancel a visit to Sweden last month to talk to a parliamentary committee. Only after weeks of lobbying did the country's police remove Mr Browder from their database. Germany, France and Britain have also publicly snubbed Russia's request.

Interpol notes that its constitution prohibits "activities of a political, military, religious or racial character"; governments are not supposed to use it to settle scores with their opponents. Nevertheless its "Red Notices", which seek the discovery and arrest of wanted persons for extradition, are open to abuse. Once issued, a Red Notice encourages—though it does not oblige—190 countries to detain the person named. 8,136 were given out last year, an increase of 160% since 2008. Interpol insists that it is not a judicial body: "queries" concerning allegations are "a matter for the relevant national authorities to address".

But Mr Browder's case is just one of many arousing controversy. Three years ago Algeria issued a Red Notice against Henk Tepper, a Canadian potato farmer, in a row involving export paperwork and suspect spuds. He was released in March after a year in a Lebanese jail and wants to sue the Canadian government for not protecting his rights. Interpol took 18 months to accept that the Red Notice issued against Patricia Poleo, a Venezuelan investigative journalist, by her government was politically motivated. Indonesia pursued Benny Wenda, a West Papuan tribal leader who ended up marooned in Britain; Belarus hounded an opposition leader, Ales Michalevic, when he fled to Poland.

Russia seems particularly fond of the tactic. It has targeted political refugees, such as Petr Silaev, an environmental protester, and Anastasia Rybachenko, a student activist now stranded in Estonia. She says Interpol is being used to "undermine democracy". During

recent elections in Estonia, Russia also reissued a Red Notice for Eerik-Niiles Kross, a politician and former spymaster who has long been a Kremlin bugbear.

Fair Trials International, a campaigning group, wants Interpol to have greater powers to vet "abusive, incomplete or inaccurate" arrest requests before they are sent to police forces around the globe. Though all Red Notices are issued to law-enforcement agencies, fewer than half are then made public. That makes it hard to challenge them in advance, or to prepare a defence in the event of a surprise arrest at a foreign airport. Fair Trials also wants an independent body to hear appeals instead of the Commission for the Control of Interpol's Files, which it says is too secretive.

Billy Hawkes, the commission's chairman, says its decisions in individual cases are formally only recommendations to Interpol's General Secretariat. He admits that aspects of its activities are "unsatisfactory", but argues that for a possible innocent person, having a Red Notice spread over the internet would be worse than issuing it in secret.

Dominic Raab, a British MP, worries that diplomatic expediency is compromising citizens' rights. Ken-Marti Vaher, Estonia's interior minister, decries requests of "a dubious nature" made to Interpol, and points out that Russia has failed to accept any of his country's offers to help investigations concerning Mr Kross. Mark Stephens, a British lawyer, says few governments are protesting about abuse because no one wants to be seen taking the side of criminals. At present, he says, challenging Red Notices is like a "game of battleships": the defence is shooting in the dark, unaware of the size and scope of the target.

From the print edition: International

1/18/2015                                  Notices / INTERPOL expertise / Internet / Home - INTERPOL

## Notices

INTERPOL Notices are international requests for cooperation or alerts allowing police in member countries to share critical crime-related information.

Notices are published by INTERPOL's General Secretariat at the request of National Central Bureaus (NCBs) and authorized entities, and can be published in any of the Organization's official languages: Arabic, English, French and Spanish.

In the case of Red Notices, the persons concerned are wanted by national jurisdictions for prosecution or to serve a sentence based on an arrest warrant or court decision. INTERPOL's role is to assist the national police forces in identifying and locating these persons with a view to their arrest and extradition or similar lawful action.

In addition, Notices are used by the United Nations, International Criminal Tribunals and the International Criminal Court to seek persons wanted for committing crimes within their jurisdiction, notably genocide, war crimes, and crimes against humanity.

## Types of Notice



**Red Notice**
To seek the location and arrest of wanted persons with a view to extradition or similar lawful action.



**Yellow Notice**
To help locate missing persons, often minors, or to help identify persons who are unable to identify themselves.



**Blue Notice**
To collect additional information about a person's identity, location or activities in relation to a crime.



**Black Notice**
To seek information on unidentified bodies.



**Green Notice**
To provide warnings and intelligence about persons who have committed criminal offences and are likely to repeat these crimes in other countries.



**Orange Notice**
To warn of an event, a person, an object or a process representing a serious and imminent threat to public safety.



**INTERPOL–United Nations Security Council Special Notice**
Issued for groups and individuals who are the targets of UN Security Council Sanctions Committees.



**Purple Notice**
To seek or provide information on modi operandi, objects, devices and concealment methods used by criminals.

## Publication

Only those notices approved for public dissemination appear on this website (the full list of Notices is available to authorized users via INTERPOL's Information System).

Any individual who is subject to an INTERPOL Notice should be considered innocent until proven guilty.

Any unauthorized alteration of any portion of any INTERPOL Notice is considered as a violation and subject to legal prosecution.

## Legal basis

A Notice is published only if it fulfils all conditions for processing the information. For example, a Notice will not be published if it violates Article 3 of the INTERPOL Constitution, which forbids the Organization from undertaking any intervention or activities of a political, military, religious or racial character.

Notices are processed in line with INTERPOL's Rules on the Processing of Data, which ensure the legality and quality of information, and the protection of personal data.

The legal basis for a Red Notice is an arrest warrant or court order issued by the judicial authorities in the country concerned. Many of INTERPOL's member countries consider a Red Notice to be a valid request for provisional arrest.

Furthermore, INTERPOL is recognized as an official channel for transmitting requests for provisional arrest in a number of bilateral and multilateral extradition treaties, including the European Convention on Extradition, the Economic Community of West African States (ECOWAS) Convention on Extradition, and the United Nations Model Treaty on Extradition.

## Diffusions

Similar to the Notice is another request for cooperation or alert mechanism known as a 'diffusion'. This is less formal than a notice but is also used to request the arrest or location of an individual or additional information in relation to a police investigation. A diffusion is circulated directly by an NCB to the member countries of their choice, or to the entire INTERPOL membership and is simultaneously recorded in INTERPOL's Information System.

© INTERPOL 2015. All rights reserved.

# Declaration of Ashot Yegiazaryan Exhibit 2

**The New York Times** | https://nyti.ms/2umhfmj

**EUROPE**

# Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts

By ANDREW HIGGINS and ANDREW E. KRAMER    JULY 15, 2017

MOSCOW — Rinat Akhmetshin, the Russian-American lobbyist who met with Donald Trump Jr. at Trump Tower in June 2016, had one consistent message for the journalists who met him over the years at the luxury hotels where he stayed in Moscow, London and Paris, or at his home on a leafy street in Washington: Never use email to convey information that needed to be kept secret.

While not, he insisted, an expert in the technical aspects of hacking nor, a spy, Mr. Akhmetshin talked openly about how he had worked with a counterintelligence unit while serving with the Red Army after its 1979 invasion of Afghanistan and how easy it was to find tech-savvy professionals ready and able to plunder just about any email account.

A journalist who visited his home was given a thumb drive containing emails that had apparently been stolen by hackers working for one of his clients.

On another occasion, at a meeting with a New York Times reporter at the Ararat Park Hyatt hotel in Moscow, Mr. Akhmetshin, by then an American citizen, informed the journalist he had recently been reading one of his emails: a note sent by the reporter to a Russian-American defense lawyer who had once worked for Mikhail Khodorkovsky, the anti-Kremlin oligarch.

Case 2:17-cv-06126-RMB-LDW Document 24-3 Filed 11/14/17 Page 18 of 40 PageID #:290

In that instance, the reporter's email had become public as part of a lawsuit. But the episode suggests Mr. Akhmetshin's professional focus in the decades since he immigrated to the United States — and the experience that he brought to a meeting last June in New York with President Trump's oldest son, Donald Trump Jr., his son-in-law, Jared Kushner, and the then-head of the Trump presidential campaign, Paul J. Manafort.

The meeting was arranged on the claim that a Russian lawyer, Natalia Veselnitskaya, would provide dirt on Hillary Clinton, though in the end, Mr. Trump and his son have insisted, neither Mr. Akhmetshin nor Ms. Veselnitskaya provided anything of value.

But Mr. Akhmetshin, a gregarious, fast-talking man with a sharp sense of humor, was a skilled practitioner in the muscular Russian version of what in American politics is known as opposition research. From his base in Washington, Mr. Akhmetshin has been hired by an ever-changing roster of clients, often Russians, to burnish their image and blacken those of their rivals. Some clients were close to the Kremlin. Others were its bitter foes.

Mr. Akhmetshin often warned his friends and contacts: "Nothing is secure." It was a conviction that emerged from the chaotic and often violent corporate battles that convulsed Russia in the 1990s, when "chyorny P.R." or "black public relations" based on stolen or fabricated documents became a powerful weapon for businessmen seeking to damage their rivals without resorting to physical threats, another frequently used tool.

The practice was rooted in the Soviet techniques of "kompromat," the collection of compromising information by the K.G.B. against foes of the Communist Party, but reached its full flowering after the 1991 collapse of Communism and the privatization of the dark arts formerly dominated by the K.G.B.

Instead of simply examining old media reports, court records and other public documents to try to dig up dirt or embarrassing gossip, Russian-style "chyorny P.R." has often focused on pilfering private information through hacking and physical intrusion into offices and filing cabinets.

In his own investigations over the years, Mr. Akhmetshin has acquired a reputation for obtaining email records, information from spyware and other data that appeared to be drawn from Russian hackers.

He has denied that, insisting that he conducted research for his clients and relayed accurate information to the press. A 2011 case illustrates his style.

Andrey Vavilov, a former Russian deputy finance minister and owner of an oil company, hired him to discredit a longtime adversary, a former Russian lawmaker named Ashot Egiazaryan. Mr. Vavilov had learned that Mr. Egiazaryan was seeking political asylum in the United States, and was "disgusted by this," Mr. Akhmetshin later said in a court deposition.

At the time, Mr. Akhmetshin was described as the Washington director of a pro-democracy think tank called the International Eurasian Institute, although United States corporation records show it had been dissolved two years earlier for failure to pay taxes. He was also lobbying against the Magnitsky Act, the law which bars Russian officials suspected of human rights abuses from entering the United States.

In a defamation lawsuit later brought by Mr. Egiazaryan in a New York federal court, Mr. Akhmetshin testified that Mr. Vavilov invited him to his home in Moscow to discuss how to derail his enemy's asylum application. "He had some cash around the house," Mr. Akhmetshin testified. "I remember there was money in like $100 bills bags."

He said Mr. Vavilov, who had been dogged for years in Russia by accusations of corruption, handed him a total of $70,000 to $80,000 in cash. That was the start of a concerted campaign to portray Mr. Egiazaryan as an anti-Semite in the news media and to Jewish organizations that then opposed his asylum application. "I met with people in Russia. I met with people in Washington D.C.," Mr. Akhmetshin testified. Mr. Egiazaryan remains in the United States, but his lawyer would not comment on his asylum status.

There is no evidence that Mr. Akhmetshin's efforts on behalf of any of his clients, whether they had close or hostile relations with the Kremlin, were illegal. Nor is there evidence that he personally engaged in the technical aspects of hacking

Case 2:17-cv-06126-RPL Document 24-3 Filed 11/14/17 Page 20 of 40 Page ID #:292

himself. But a 2015 lawsuit filed in a New York State court put forward detailed allegations.

An international mining company controlled by a trio of flamboyant millionaires from Kazakhstan sued in a New York State court, accusing Mr. Akhmetshin of orchestrating a hacking campaign against their company to benefit a rival Russian tycoon, Andrey Melnichenko. Each side of the dispute is known for aggressive business practices and lavish excesses.

Court papers filed in November 2015 on behalf of the Kazakhs' company, International Mineral Resources, or I.M.R., described Mr. Akhmetshin as "a former Soviet military counterintelligence officer who moved to Washington, D.C. to become a lobbyist" and "developed a special expertise in running negative public relations campaigns."

Mr. Akhmetshin has called this characterization misleading. He was, he said, drafted as a young man to serve in a military unit performing counterintelligence functions during the Soviet-Afghan war. As an enlisted man, he said, he never received any training in "negative public relations."

The suit alleged that Mr. Akhmetshin was retained by EuroChem VolgaKaliy, a Russian potassium mining company controlled by Mr. Melnichenko, which was involved in a $1 billion litigation with I.M.R. The suit also names as a defendant Salisbury & Ryan, a New York law firm representing EuroChem.

The lawsuit alleged that Mr. Akhmetshin was hired to hack into the computer systems of I.M.R. and had stolen about 28,000 files, or about 50 gigabytes of data. It said the sensitive material was then distributed to journalists and others in an effort to harm the company's reputation.

The suit claims that Mr. Akhmetshin stole passport information, emails and personal contact lists for executives within I.M.R., along with bank account information; loan agreements; business strategy documents; board meeting minutes; drafts of market-sensitive documents; and financial forecasts and projections for the company.

An investigator for I.M.R. reported personally witnessing and overhearing a conversation at a London coffee shop during which Mr. Akhmetshin handed someone an external hard drive that Mr. Akhmetshin described as containing files obtained from I.M.R. computers, according to the lawsuit.

The lawsuit was withdrawn in 2016, and Mr. Melnichenko denied all the allegations in it.

Mr. Akhmetshin has denied that he hacked the company's computers.

An early client of Mr. Akhmetshin's was an opposition leader from Kazakhstan who, from self-imposed exile in the West, was waging a lonely campaign against one of Mr. Putin's closest allies, the president of Kazakhstan, Nursultan Nazarbayev.

And in neighboring Kyrgyzstan, he helped to unravel a brazen corruption scheme by a former pro-Kremlin leader and his family that had been cheating the population, poor already, out of millions of dollars.

On other occasions, however, Mr. Akhmetshin worked on causes that clearly benefited the Kremlin, like a long-running campaign by Ms. Veselnitskaya to get Congress to repeal legislation imposing sanctions on Russian officials suspected of corruption and involvement in the death of Sergei L. Magnitsky, a Russian accountant who died in a Moscow jail in 2009.

Mr. Akhmetshin had also at times been in touch with Russian government officials, court records show.

In 2010, he submitted an op-ed column to The Washington Times on behalf of Viktor Ivanov, then the director of Russia's anti-narcotics police, according to one of Mr. Akhmetshin's own emails, subpoenaed as evidence in a case in the Southern District of New York. Mr. Ivanov is a longtime veteran of Russia's security services.

Mr. Akhmetshin has spoken openly about his service in the Soviet military in Afghanistan, and his current work throughout Russia and Central Asia.

Once, a reporter arrived for a meeting at a coffee shop in Moscow with Mr. Akhmetshin and peered around the room, trying to see where he was sitting.

Mr. Akhmetshin had come in with what amounted to a disguise: He sat smiling at a table, wearing a hat resembling a skull cap and his beard grown to an impressive length. He was headed next, he said, on an assignment to Afghanistan and had assumed the appearance of an Afghan elder.

David D. Kirkpatrick contributed reporting from Cambridge, Britain, Sharon LaFraniere from Washington and Bryant Rousseau from New York.

A version of this article appears in print on July 16, 2017, on Page A1 of the New York edition with the headline: In the Room, A Practitioner In Dark Arts.

© 2017 The New York Times Company

# Declaration of
# Ashot Yegiazaryan
# Exhibit 3

Case 2:17-cv-06124-PA-DFM   Document 34-2   Filed 11/14/17   Page 24 of 40   Page ID #:296

**The New York Times** | https://nyti.ms/2vgaNd2

U.S.

# Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections

By SHARON LaFRANIERE, DAVID D. KIRKPATRICK and KENNETH P. VOGEL    AUG. 21, 2017

WASHINGTON — Rinat Akhmetshin, a Russian immigrant who met last summer with senior Trump campaign officials, has often struck colleagues as a classic Washington mercenary — loyal to his wife, his daughter and his bank account. He avoided work that would antagonize Moscow, they suggested, only because he profited from his reputation as a man with valuable connections there.

But interviews with his associates and documents reviewed by The New York Times indicate that Mr. Akhmetshin, who is under scrutiny by the special counsel Robert S. Mueller III, has much deeper ties to the Russian government and Kremlin-backed oligarchs than previously known.

He has an association with a former deputy head of a Russian spy service, the F.S.B., and a history of working for close allies of President Vladimir V. Putin. Twice, he has worked on legal battles for Russian tycoons whose opponents suffered sophisticated hacking attacks, arousing allegations of computer espionage. He helped federal prosecutors bring corruption charges against an American businessman in the former Soviet Union who turned out to be working for the C.I.A.

He also helped expose possible corruption in government contracting that complicated American efforts to keep troops at an air base in Kyrgyzstan — an American presence that the Russians fiercely opposed.

In short, Mr. Akhmetshin's projects over two decades in Washington routinely advanced the Kremlin's interests, especially after he became an American citizen in 2009. American counterintelligence agents took notice of his activities, but drew no conclusions about where his allegiances lay, according to a former law enforcement official who spoke on condition of anonymity, citing government secrecy rules.

Mr. Akhmetshin's meeting with Trump campaign officials is of keen interest to Mr. Mueller, who is investigating the Kremlin's efforts to interfere in the 2016 election. Of all the visitors who attended the June 2016 session at the Trump Tower, he appears to have the most direct ties to Russian intelligence. The session was arranged by a Russian businessman close to Mr. Putin whose emissary promised damaging information about Hillary Clinton as "part of Russia and its government's support for Mr. Trump."

Mr. Akhmetshin, who did not respond to repeated requests to be interviewed for this article, has said he was a last-minute guest at an inconsequential get-together. Trump campaign officials have dismissed the meeting as part of an effort to amend an American law that placed sanctions on Russians for human rights abuses. The 2012 law, known as the Magnitsky Act, infuriated Mr. Putin, whose government retaliated by restricting adoptions of Russian children by Americans.

Ronald J. McNamara, a former staff member of the United States Commission on Security and Cooperation in Europe who met with Mr. Akhmetshin about Central Asian issues, said Mr. Akhmetshin openly alluded to involvement with Russian intelligence. "My understanding was that he had come from the security agencies in the Soviet Union-Russian Federation," Mr. McNamara said. "He did not make it a secret."

Mr. Akhmetshin, 49, said he is no Russian spy. "I am the target of a well-coordinated and financed smear campaign," he said last month in a text message to The Times.

Keenly intelligent, relentlessly charming and assiduously opaque about his work, Mr. Akhmetshin sometimes referred to his contacts by pseudonyms and collected his salary in stacks of hundred-dollar bills. A trained biochemist who speaks four languages, he described himself on one official document as a "househusband. " He identified himself as the head of a Washington think tank for years after it was officially dissolved.

"I think he works for us. I don't think he works for them," said Lanny Wiles, a veteran Republican political operative who has worked with Mr. Akhmetshin for more than 15 years. "But I don't know what he really does."

## Rise of an Influence Peddler

Born in Kazan, Russia, about 500 miles east of Moscow, Rinat Rafkatovitch Akhmetshin was drafted at age 18 into the Soviet army's war against Afghanistan. He served from 1986 to 1988 and again in 1991. He described himself on his visa application for the United States as a sergeant who rose to the rank of lieutenant in the military police, specializing in communications. He told some journalists that he worked with a military counterintelligence unit, but said he never joined Russian intelligence services — unlike his father, sister and godfather.

In 1992 he graduated with honors from Kazan Federal University, and two years later arrived in Washington as a graduate student in chemistry at the Catholic University of America. He married a fellow Russian chemistry student and received his Ph.D. But he immediately abandoned his esoteric study of mechanistic enzymes and burrowed into Washington's foreign lobbying scene, promoting clients from Russia and former Soviet states.

He never formally studied English, he said, or owned a car: He pedaled about Washington on a bright orange bicycle. But he was witty and erudite, a lover of literature, opera and snowboarding. Matthew Bryza, a former staff member in charge of Central Asia issues at the National Security Council under President George W. Bush, remembers Mr. Akhmetshin as "very smart, slick guy" serving as "the paid drone of unsavory, out-of-fashion former Soviet leaders looking to launder their reputations."

Case 2:17-cv-06126-PA Document 24-2 Filed 11/14/17 Page 27 of 40 Page ID #:299

"He would boast about ties and experience in Soviet intelligence and counterintelligence to give himself some cachet and make himself a mystery man," he said.

Mr. Akhmetshin's gateway to Washington was Edward Lieberman, a lawyer with corporate and political clients in former Soviet countries who was married to President Bill Clinton's former deputy chief of staff, Evelyn S. Lieberman, who died in 2015. He called Mr. Lieberman, who could not be reached for comment, a personal adviser.

Together the two started the Eurasian Institute for Economic and Political Research. Supposedly set up to promote democratic reforms in former Soviet states, it was essentially a vehicle to burnish the reputation of one client, Akezhan Kazhegeldin, an ex-K.G.B. officer and the former prime minister of Kazakhstan. Mr. Kazhegeldin had fled under a cloud of corruption charges and was seeking Washington's support to challenge his rival, Kazakhstan's president, Nursultan Nazarbayev.

Mr. Akhmetshin worked to undercut his client's rival by funneling information to American prosecutors pursuing bribery charges against James Giffen, an American businessman close to the Kazakh president, according to people involved with the case. The prosecutors discovered only belatedly that Mr. Giffen had worked for the C.I.A. in the former Soviet Union.

By 2005 the government of another former Soviet republic, Kyrgyzstan, had hired Mr. Akhmetshin to investigate whether Washington had bribed the family of the country's former president to keep an American air base there. The Manas base, established as a staging ground for American forces in Afghanistan, was a major source of friction with the Russians.

The Kyrgyz ambassador to Washington at the time, Zamira Sydykova, said Mr. Akhmetshin arranged an interview with a Times reporter and escorted her to it. The resulting article helped set off a Washington controversy and ultimately, a congressional investigation. Kyrgyzstan finally forced the United States to abandon the base in 2014.

In an affidavit that year, Mr. Akhmetshin said he worked closely with the American government about the location of the base. But Thomas Graham, the National Security Council's Russia specialist from 2002 to 2007, said the controversy put Washington on the defensive. "Looking into allegations of fraud or bribery — anything that would complicate our presence at that air base — was in Russia's interests," he said.

Mr. Akhmetshin's work took him back and forth to Europe more than once a month, on trips lasting a few days each. Senator Charles E. Grassley, the Iowa Republican who is now chairman of the Senate Judiciary Committee, has sought to determine whether his travel pattern raised concerns among immigration officials who approved Mr. Akhmetshin's application for American citizenship in 2009.

Once naturalized, Mr. Akhmetshin began traveling regularly to Moscow and taking on more overtly pro-Russian projects. The new work led him into legal entanglements, the halls of Congress and eventually Trump Tower.

## The Hacking Campaigns

Few episodes from Mr. Akhmetshin's past seem more relevant to Mr. Mueller's investigation than his work for two Russian billionaires accused of infiltrating their adversaries' computers during nasty legal battles.

The Trump Tower meeting in June 2016 took place less than a week before revelations that hackers had penetrated the Democratic National Committee's computers and obtained a trove of emails. Investigators have traced digital espionage to Russian spy agencies. There is no public evidence that Mr. Akhmetshin played any role in the D.N.C. hack.

The first hacking case, which has not previously been reported, began when Mr. Akhmetshin served an alliance of businessmen led by Suleiman Kerimov — a financier close to Mr. Putin in a commercial and political dispute with a Russian competitor, Ashot Egiazaryan.

In early 2011, two London lawyers on Mr. Egiazaryan's team separately received suspicious emails and hired forensic experts to scrutinize them, according to people

Case 2:17-cv-06126-RISL Document 24-2 Filed 11/14/17 Page 29 of 40 Page ID #:301

involved in a Scotland Yard investigation. The experts found that the messages concealed spyware meant to infiltrate their computers, and they fed traceable documents into the spyware that were then opened by computers registered at the Moscow office park of one of Mr. Kerimov's companies.

After an inquiry of more than 18 months, Scotland Yard investigators concluded in January 2013 that they lacked sufficient evidence to bring any charges, a spokesman said. Representatives of the lawyers targeted declined to comment.

Mr. Akhmetshin has said in court papers that he was paid only by one businessman in the alliance with Mr. Kerimov, but coordinated with Mr. Kerimov's team.

Two years later, hacking accusations arose in another case, this time lodged directly against Mr. Akhmetshin. He worked as a consultant to a law firm representing EuroChem, a fertilizer and mining company controlled by another Russian billionaire close to Mr. Putin — Andrey Melnichenko. Mr. Akhmetshin's target was a rival mining company, International Mineral Resources.

Within months, documents stored in International Mineral Resources's computer systems began surfacing outside the company, leaked to journalists and others. The company concluded that its computers had been hacked, and replaced its servers. In lawsuits filed in federal court in Washington and state court in New York, the company accused EuroChem and Mr. Akhmetshin of computer espionage.

EuroChem's information technology chief, Vladimir Chibisov, previously worked in the Russian government. He had written a book promoted as "a hacker's Bible," which he described as a book "about us — about Russian programmers, men of the '80s and '90s" who "had done programming, and even a bit of hacking."

Mr. Akhmetshin personally handed a thumb drive containing stolen documents to a lawyer engaged in another matter potentially damaging to the rival company, according to a person familiar with the matter. The same thumb drive was later obtained by investigators, and someone using the initials "R.A." had gained access to its contents, according to court papers.

A spokesman for Mr. Melnichenko said in a statement that he has never condoned hacking or other illegal activity, nor had he ever met or known Mr. Akhmetshin. The spokesman said Mr. Chibisov's book was "tongue in cheek" and "cannot possibly be taken seriously."

An investigator for the targeted company also testified that he had followed Mr. Akhmetshin in January 2014 to a meeting at London's Cafe Royal and watched him hand over an external hard drive to another individual. He said he had overheard Mr. Akhmetshin claim that he had paid a team of Russian hackers "a lot of money" for the records.

Mr. Akhmetshin acknowledged in a deposition that he had turned over a hard drive with information about the firm's owners. But he said he had obtained the data from a Kazakh contact through a loose network he called the "London Information Bazaar." Asked about computer hacking, he replied, "I do not know a single person who could do that."

International Mineral Resources dropped the lawsuits without explanation in early 2016, withdrawing all allegations before they could be adjudicated. The company said in a statement Friday that it dropped the charges "after careful consideration."

## A Key Kremlin Contact

During the same period that Mr. Akhmetshin was accused of being involved in various hacking schemes, he appears to have been nurturing a relationship with Viktor Ivanov, once the deputy head of Russia's intelligence service, the F.S.B., and until last year a top aide to Mr. Putin.

From 2009 to 2014, Mr. Ivanov led the Russian side of a joint effort with the Americans to combat drug trafficking in Afghanistan, part of an early Obama administration initiative to improve relations between Moscow and Washington.

When Mr. Ivanov traveled to Washington to promote the effort in October 2010, Mr. Akhmetshin helped shepherd him around town. In a deposition filed in one of

the hacking cases, Mr. Akhmetshin testified that he helped facilitate the Washington visit with one of Mr. Ivanov's aides, with whom he had served in the Red Army.

In an affidavit in that same case, Mr. Akhmetshin said he had been in email contact with Mr. Ivanov on matters ranging "from narco-trafficking and terrorism in Afghanistan to surveillance of undercover agents, suspected undercover agents and their identities."

Reporters who encountered Mr. Akhmetshin during his travels to Afghanistan said he grew a beard and wore a skullcap to blend in with the local population. He never identified whom he worked for, but two former American officials involved with the counternarcotics program said the American side did not hire him.

Mr. Ivanov, who retired early last year, could not be reached for comment about whether Mr. Akhmetshin was on the Russian government's payroll.

Russia ended the counternarcotics cooperation in 2014 after the United States imposed sanctions on Mr. Ivanov and other Putin allies in retaliation for Russia's invasion and seizure of Ukraine's Crimea region.

There, too, Mr. Akhmetshin had tried to ally with Ukraine's pro-Moscow elements. Before the 2014 invasion, he told reporters, he unsuccessfully sought consulting work with the political party dominated by the nation's pro-Putin president, Viktor F. Yanukovych. A popular revolt forced Mr. Yanukovych to flee to Russia.

Mr. Akhmetshin told journalists that he was a longtime acquaintance of Paul J. Manafort, who served as a high-paid consultant to Mr. Yanukovych for years before becoming chairman of the Trump campaign. Jason Maloni, a spokesman for Mr. Manafort, said, "Paul doesn't know and hasn't worked with the man."

Last year, Mr. Akhmetshin took on a new project high on the Kremlin's agenda: a $240,000 lobbying campaign to amend the Magnitsky Act, which imposes sanctions on Russians for human rights abuses. The law was named after Sergei L. Magnitsky, a Russian tax lawyer who died in custody after he uncovered a $230 million tax fraud allegedly tied to Russian officials. Several wealthy Russian

businessmen financed a nonprofit group to spearhead the campaign, which was represented by Mr. Akhmetshin and a Russian lawyer named Natalia Veselnitskaya.

Donald J. Trump Jr. has said the promise of damaging information about Hillary Clinton was just an excuse for Ms. Veselnitskaya to get into Trump Tower to talk about why the law should be changed. Mr. Akhmetshin, a Washington resident, has told reporters that he just happened to be lunching with Ms. Veselnitskaya in Manhattan that day when she spontaneously invited him to the meeting with the president's son, son-in-law Jared Kushner and Mr. Manafort. He did not explain why she wanted him there.

After Mr. Akhmetshin's presence came to light, a spokesman for Mr. Putin, Dmitry Peskov, told reporters: "We don't know anything about this person."

### Correction: August 23, 2017

An article on Monday about a Russian immigrant who met last summer with senior Trump campaign officials referred incorrectly to the location of Kazan, Russia. It is 500 miles east of Moscow, not west.

Sharon LaFraniere and Kenneth P. Vogel reported from Washington, and David D. Kirkpatrick from London. Andrew E. Kramer and Sophia Kishkovsky contributed reporting from Moscow, and Michael S. Schmidt and Eileen Sullivan from Washington. Susan Beachy contributed research.

A version of this article appears in print on August 21, 2017, on Page A1 of the New York edition with the headline: Guest at Trump Tower Meeting Has Aided Close Allies of Putin.

© 2017 The New York Times Company

# Declaration of
# Ashot Yegiazaryan
# Exhibit 4

Date: 27th May 2015

# D E C L A R A T I O N
# O F
# T R U S T

made by

CTX Treuhand AG

(the Trustees)

Constituting

The

**ALPHA Trust**

# I N D E X   T O   C L A U S E S

**Clause**                                                                    **Page**

1.   Definitions                                                                6

2.   Proper Law, Forum of Administration, Jurisdiction
     and Change thereof                                                        7

3.   Power to Terminate                                                         8

4.   Trust for Sale                                                            8

5.   Trust of income and capital                                              8

6.   Payments to Minors                                                       10

7.   Interests not attachable                                                 10

8.   Power to add and exclude Beneficiaries                                  11

9.   Remuneration of Trustees                                                11

10.  Change of Trustees                                                       12

11.  Power to delegate                                                        13

12.  Power to alter and revoke                                               13

13.  Additional powers                                                        13

14.  The Protector                                                            13

15.  Duties of the Trustees, liability and indemnity                        14

16.  Accounts and Information                                                14

**THE FIRST SCHEDULE**                                            15

       Administrative Powers                                15

1.    Power of Investment                                     15

2.    Power to lend and to give guarantees                    16

3.    Power to permit occupation of property and

       enjoyment of chattels                               16

4.    Power to borrow                                        16

5.    Powers in relation to real property                    16

6.    Powers in relation to chattels                         18

7.    Power to trade                                         18

8.    Power to give indemnities                              18

9.    Exclusion of apportionment                             19

10.   Power to deal with insurance policies                  19

11.   Release of powers                                      20

12.   Power of appropriation                                 20

13.   Power to vote and to employ nominees and custodians    20

14.   Power to delegate management of investments            20

15.   Power to receive remuneration                          21

16.   Power to promote companies                             21

17.   Trustees not bound to interfere in business of
      company in which the Trust is interested            22

18.   Power to insure property                               22

19.   Power to appoint agents                                          22

20.   Power to permit self-dealing                                  22


**THE SECOND SCHEDULE**                                           23


**THE THIRD SCHEDULE**                                            24

**THIS DECLARATION** OF TRUST is made the 27th day of May Two thousand and fifteen.

<u>BY</u>

CTX Treuhand AG ("the Trustees" which expression shall where the context so admits include the trustees or trustee for the time being of this Trust)

<u>WHEREAS</u>

(A)   THE Trustees acknowledge having received the property specified in the Second Schedule to be held upon the trusts hereinafter contained concerning the same.

(B)   IT is intended that this Trust shall be irrevocable

(C)   THIS Trust may be referred to as

**" ALPHA TRUST"**

**NOW THIS DEED WITNESSETH** as follows:

1.        **Definitions**

1.1.      IN this Deed where the context so admits

1.1.1.    "the Trust Fund" means
          - the sum specified in the Second Schedule and
          - all money investments or other property paid or transferred by any
            person or persons to or so as to be under the control of and (in either
            case) accepted by the Trustees as additions and
          - all accumulations (if any) of income directed to be held as an accretion
            to capital and
          - the money investments and property from time to time representing the
            said money investments property additions and accumulations;

1.1.2.    "the Beneficiaries" means and includes the persons named or described in
          the Third Schedule hereto:

1.1.3.    "the Trust Period" means the period commencing on the date of this Deed
          and ending on the earlier of the last day of the period of 80 years from the
          date of this Deed or such earlier date as the Trustees shall by virtue of
          their power under clause 3 hereof specify;

1.1.4.    "the Proper Law" of this Trust means the law of the jurisdiction to which the
          rights of all parties and the construction of each and every provision of this
          Trust shall be subject;

1.1.5.    "Minor" means any individual who has not attained the age of 20 years
          notwithstanding that such individual may by the laws of his or her domicile
          be of full age and "full age" shall be construed accordingly;

1.1.6.    "Person" means any individual or body of persons corporate or incorporate;

1.1.7.    "Issue" means children and remoter issue whether legitimate, illegitimate,
          adopted or legitimated and step-children;

1.1.8.    "Protector" means the Person holding for the time being the office of
          Protector pursuant to any appointment made in accordance with Clause 14
          hereof;

1.2.      Words importing the singular shall include the plural and the masculine
          gender shall include the feminine and vice versa.

2.          **Proper Law, Forum of Administration, Jurisdiction**

2.1.        THIS Trust is established under the laws of the Principality of Liechtenstein and in particular Articles 897 to 932 of the Personen- und Gesellschaftsrecht (statute number 4 of 20th January 1926) shall be applicable to this Trust.

2.2.        The forum of administration of this Trust shall be in the Principality of Liechtenstein and the rights of all parties and the construction and effect of each and every provision hereof shall be subject to the exclusive jurisdiction of and construed only according to the laws of the Principality of Liechtenstein.

2.3.        The Trustees may register this Trust with the Oeffentlichkeitsregister of the Principality of Liechtenstein or deposit this Deed and any amendments thereto with the Liechtenstein Princely Court as they think fit.

2.4.        The Trustees may at any time declare in writing that from the date of such declaration the Proper Law of this Trust shall be that of any specified jurisdiction (not being a jurisdiction under the law of which this Trust would be capable of revocation) and that all rights under this Trust and its construction and effect shall be subject to and construed according to the laws of that jurisdiction and so often as any such declaration shall be made the Trustees shall be free to make such alterations and/or additions in or to the trusts powers and provisions of this Trust as they may consider necessary or desirable so that the trusts powers and provisions hereof shall then (mutatis mutandis) be as valid and effective as they were immediately prior to the making of such declaration.

2.5.        In the case that in the country or state of the forum of administration any of the events referred to in sub-clause 2.5.2. hereof shall occur the trustee or trustees resident or having a place of business at the forum of administration shall with immediate effect and without the necessity of filing or signing any documents cease to be trustee or trustees hereof and be divested of the title to the Trust Fund and the trustee or trustees shall have no claim or claims against the Trust Fund in respect of charges or expenses whether or not such claim or claims have accrued at the time the events aforesaid have occurred.

2.5.1.      Immediately following the trustee or trustees ceasing to be trustee or trustees hereof the continuing trustee or continuing trustees shall change the forum of administration and the law applicable to this Trust and appoint a new trustee or new trustees and effect such changes, alterations and/or modifications to this Deed as they consider necessary to ensure that this Deed is as valid under the new law as under the law previously applicable.